No. 34.—JOHN DOE *ex dem.* of Philip West *et al.* plaintiffs in error, *vs.* RICHARD ROE, casual ejector, and JAMES DRAWHORN, tenant, defendant, and HINES HOLT, co-defendant.

[1.] If the person who is the true owner of land, sells it at a time when it is not held adversely to him, and gives his bond for titles to the purchaser; and afterwards, in performance of the condition of the bond, makes a deed to the purchaser, the deed is not within the 32*d Henry VIII.* as to bracery and the buying of titles, although the land, at the time when the deed was made, had come to be held adversely to the vendor and the purchaser.

Ejectment, in Lee. Tried before Judge ALLEN, March Term, 1856.

Philip West brought an action of ejectment against James Drawhorn, as tenant in possession, to recover lot of land No. 281, in the 14th district of Lee County, and *mesne* profits. Subsequently, Hines Holt appeared in Court and, by order, was made a party defendant to said action.

The following is a brief of the testimony introduced by the plaintiff on the trial :

A copy grant in the usual form, from the State of Georgia to William Hancock, sen. of Amason's district, Wilkes County, for lot of land No. 281, in the 14th district of the 1st section of Lee County ; said grant issued by Wilson Lumpkin, Governor of Georgia, dated the 19th day of December, 1831, and in pursuance of the several Acts of the General Assembly of said State, passed on the 19th day of June, 1825, and on the 14th and 27th days of December, 1826, to make distribution of the land acquired of the Creek Nation, by a treaty concluded at the Indian Springs, on the 12th day of February, 1825, and forming the Counties of Lee, Muscogee, Troup, Coweta and Carroll.

Then a bond or other contract, in writing, made by William Hancock to Thomas Kilpatrick, with an assignment thereon to Daniel Methvin, together with the testimony taken by commission of Archibald Ritch, to prove the execution of said bond and of said transfer. Said bond is dated the 11th day of March, 1828. The obligor, Hancock, therein acknowledges himself bound to said Kilpatrick in the penal sum of $200. The condition recites that the former has sold to the latter said lot of land, and that said bond is to become void if, after the plat and grant therefor is taken out, Hancock shall make to Kilpatrick " a lawful warranty title" for said land.

Said transfer is as follows :

" For value received, I transfer the within bond to Daniel Methvin, this 7th October, 1833.

THOMAS KILPATRICK.

ARCHIBALD RITCH testifies, that William Hancock made the bond to Thomas Kilpatrick ; it was made in Newton County, Georgia, on the 11th March, 1828 ; witness is the subscribing witness thereto, as a Justice of the Peace ; be-

lieves the transfer to be in the handwriting of Thomas Kilpatrick, to the best of his recollection, from having often seen him write. Of his own knowledge, does not know what has become of Kilpatrick. Five or six years ago, his son told witness he understood he was dead. The signature in said bond is the genuine signature of said Kilpatrick; he lived near witness for several years; has seen him write often; and from him his intimate acquaintance with his handwrite, believes. the signature on the back of said bond to be his; has heard he was dead; does not know it. Witness married said Kilpatrick to Martha Lyon while he was a Justice of the Peace; they had some four or five children; knows not how many were males or females, or their ages.

In 1827, William Hancock came to witness' house in company with Elisha Trammell; knew him eight or nine months before and after the giving the bond, and perhaps a little longer; does not know who wrote the original bond; does not know that it was brought to witness already written. There looks to be some difference in the handwriting; does not know, only as the dates show, whether the signatures were written at or about the same time. Hancock lived in Newton County about two years; knows nothing more of his whereabouts; saw no money paid or notes given; does not know what occurred. The last time witness saw Kilpatrick, was about the year 1828 or 1829, in said Newton County; saw him write in Kilpatrick's books; kept a grocery in said County, near witness' residence; does not conclude it is Kilpatrick's handwriting from a comparison with other writings of his; could not name the number of times, he has seen him write so frequently; knows not as to the uniformity of his handwriting; wrote only a tolerable hand; does not know whether he, witness, is an expert or not in the detection of forgeries; could not detect the forgery of a person's handwrite, unless intimately acquainted with it.

Then, a deed from William Hancock of Talbot County to Daniel Methvin of Coweta County, dated the 16th day of March, 1847, with clause of warranty for said lot, made in

said Talbot County—consideration, $200. Witnesses, Elbert Manes and Benj. Manes, J. P. Said Hancock signing by making his mark. Deed duly recorded.

A deed from Daniel Methvin to Philip West for said lot, executed in Lee County, in presence of John Whitsett and B. G. Smith, J. P. dated the 24th day of May, 1847, and duly recorded. Consideration, $350.

JESSE L. BAKER and JAMES McCAULY testified, under commission, that they were acquainted with Thomas Kilpatrick, and knew him in Newton county, about fifteen or twenty years ago; he resided in said county several years; left there sometime between the years 1835 and 1840; cannot state positively whether said Kilpatrick is alive or dead; but it is generally understood he was dead; they heard he was dead about ten years ago; they believed he was dead, because such was the uncontradicted report; they knew his family; he was a married man, and they knew his wife; four of his children by said marriage survived him, to-wit: William, (since dead,) Marion, Newton and Margaret. All the last named are now living; the ages of the sons vary between twenty-two and thirty years; and, they suppose, Margaret is about 14 years of age, and is unmarried; the widow is still in life; has never married again, and her name is Martha Kilpatrick. They know of no other children.

ARRINGTON H. PHILLIPS and BENJAMIN GREEN testified, that Hines Holt and Michael Perry were in possession of said lot from early in January, 1847; they *deadened* forty acres of it at that time, and have continued to cultivate the same; worth five dollars per acre per annum for rent; that for the last three or four years there has been as much as eighty acres cleared on said land, and in cultivation, worth the same price for rent; that Philip West, at and before the first of January, 1847, and afterwards, later than May, 1847, as testified to by Benjamin Greene, owned an adjoining lot, No. 270, in same district, and had inclosed under his fence and in cultivation, a strip of land over the line on No. 281. Witness owned the plantation before West did,

and when he came in possession of it nineteen years ago, he found the said portion of the said lot inclosed; he set up no claim to it himself, but does not know whether West did or not; he has since bought the same plantation back; and when he bought it back from West, he gave him directions to hold on to the inclosure for him, West.

Benj. GREEN testified, that West and himself attended the sale of said land when sold by McElven as administrator, and that he, Green, bid for the land at said sale; that the strip of land inclosed in his fence contained between three and four acres; that he had never owned or claimed, sold or bought, 281, or any part of it; that West, in 1846 and 1847, lived on the adjoining plantation, and knew of the purchase and possession of the defendants.

WILLIAM MOON testified, that on the 10th day of January, 1847, as the overseer of the defendant, (Holt,) he took charge of said plantation, and moved and built cabins on 281, and cleared and cultivated that year thirty-five or forty acres of said lot, and that it was worth $12 per acre to clear and fence the same.

BERRY M. WILLIAMS testified, that at the time suit was commenced, the premises in dispute were in possession of James Drawhorn, as the over-seer of Hines Holt.

The plaintiff here rested his case.

The defendants then put in evidence the original grant, the substance of which has already been stated, and being the same as that described, except that these additional words, appear inscribed on this, to-wit:

" Received eight dollars of Luke Turner.
　　　　　　　　　JOHN WILLIAMS."

A *fi. fa.* issued from the Justice's Court of the 168th district G. M. Wilkes County, in favor of Luke Turner, *vs.* William Hancock, sen. for the sum of six dollars, principal, and interest and costs. Dated the 17th day of April, 1826.

A levy is indorsed thereon, of one bed and furniture, four earthen plates, one pewter pepper box, four pewter plates and

one tin tumbler.    Dated 7th November, 1826.    There is this.
further entry:

"This property claimed by a different person, and the
claim sustained.    March 6, 1827.

JAMES COLLY, Const."

On the 23d day of November, 1831, James Moore, Con-
stable, makes a return thereon of "no property."

And then appear these additional entries thereon:

"GEORGIA, LEE COUNTY:

*To any lawful officer for said county to execute and return,*
*this the 17th April, 1832.*

"Levied the within *fi. fa.* on lot of land No. 281, in the
14th district of Lee County, as the property of William Han-
cock.    This April 17, 1832.

S. L. HOLLIDAY, Const."

"The within levy sold for thirty-five dollars, which, after
paying the cost of backing, levying, advertising and sale, and
satisfying, in full, this *fi. fa.* leaves in my hands unexpended,
the sum of eleven dollars.    July 3d, 1832.

JAS: R. MARTIN, Sheriff."

A deed from said Martin, Sheriff of Lee County, to John
Woolbright, for lot 281, 14th Lee.    Dated 3d July, 1832.
Witnesses, Thomas Hughes and John Richards, J. I. C.;
consideration, thirty-five dollars, describing the land as levied.
on by a *fi. fa.* from a Justice's Court in Wilkes County.
Luke Turner *vs.* William Hancock, sen.    Duly recorded.

A deed from said Woolbright to William Spence, for said
lot, dated 28th day of February, 1834; made in Lee County;
consideration, $200.    Witnesses, Horatio Sims and Moses S.
Leger, J. P.    Duly recorded.

A deed from Wm. Spence to J. W. Cowart for said lot, dated
28th day of July, 1834; consideration, $300; made in Sum-

ter County; witnesses, John B. Kennedy, Thomas H. Dixon; recorded in Lee County, 28th day of November, 1850.

A deed from John W. Cowart to George Wyche for said lot, dated 2d day of January, 1836; witnesses, Nancy G. Brown and D. H. Brown, J. P.; made in Sumter County; properly recorded.

A deed from Elias McElven, administrator of George Wyche, to William H. McElven for said lot, dated the 28th day of January, 1848; made in Decatur County; sale on the first Tuesday in November, 1845; said deed containing sufficient recitals to authorize the sale; but beyond that, there was no order to sell by the proper Court introduced, or any other evidence of any; said deed recorded 6th day of March, 1850.

Plaintiff's Counsel objected to the reading said deed in evidence without said order; which objection was over-ruled by the Court.

A deed from William H. McElven to Elias McElven for said lot of land, dated the 28th day of January, 1848; made in Decatur County; witnesses, John H. McElven and N. H. Hicks, J. P.; recorded the 6th day of March, 1850.

A bond for titles for said lot to Michael W. Perry, made by Elias McElven, conditioned to make titles on the payment of the purchase money; made in Lee County on the 25th day of December, 1846.

Transfer on said bond of two thirds interest in said bond to Hines Holt, dated the 25th day of February, 1847.

A deed from Elias McElven to Michael W. Perry for said lot, dated 28th day of May, 1849; made in Lee County, and recorded the 6th day of March, 1850.

A deed from Michael W. Perry to Hines Holt for balance of interest in said lot, dated the 27th day of January, 1852; made in Muscogee County, and recorded the 4th day of February, 1856.

A deed from William Hancock to Michael W. Perry and Hines Holt, made in Talbot County, dated the 21st day of October, 1847; duly recorded.

The defendants having here rested their case, plaintiff introduced in rebuttal a copy, plat and grant from the State of Georgia to William Hancock, senior, of Reeves' district, Wilkes County, for lot No. 18, in the 3d district of the 4th section of the County of Coweta, signed by William Schley, Governor, and dated the 30th day of November, 1835, and containing the same recitals as the grant first described.

Luke Turner then testified, that he lived in Wilkes County; has lived there about 31 years, in dist. No. 168, formerly Capt. B. B. Reeves' dist; was acquainted with two persons in said county named William Hancock, father and son; never heard of but the two, and they lived within a few miles of witness; saw them frequently; became acquainted with them in 1823, and knew them as long as the old man lived, and the young man remained there; cannot tell when the young man left the county; the old man died in Wilkes; witness had a small execution against the old man in his own favor; does not know whether or not there was any against the young man; knows he had the execution, because it was his own, and he saw it frequently. Witness was engaged a part of the time selling dry goods and groceries, and farming the rest of the time; lived in the same neighborhood with the Hancocks, and sold goods to the old man; had a small execution unsatisfied against the old man, which he traded to John Woolbright; does not know that either father or son served in the war of 1812, or any other war; said execution issued, witness supposes, from a Court; witness put his claim against the old man in the hands of the proper authority, and received from same an execution, such as usually issues from a Justice's Court, obtained in the usual way.

Also, the *Common Law* docket of Lee Superior Court, the statement of the cases, and the entries thereto, of the case of John Doe *ex dem.* Philip West *vs.* William S. Moore, tenant in possession, and Hines Holt and Michael Perry defendants, returnable to the November Term of said Court for the year 1847, being No. 5 on said docket—after first proving by

Steven V. Gay, former Clerk, the existence and the loss of the record of it, and by Lott Warren, Esq. then Judge of said Court,. and now Counsel for defendants, that the lot of land sued for in that suit, is the same in controversy in this.. There was a verdict for defendants at Common Law, and an appeal entered. By the entry introduced on the appeal docket, it appeared as dismissed by plaintiff at May Term, 1851.

The evidence having here closed, Counsel for plaintiff requested the Court to charge the Jury—

1st. That the deed made in March, 1847, by William Hancock to Daniel Methvin, the assignee of Kilpatrick, under the bond made by Wm. Hancock in 1828, is not void for maintenance under the Statute 32*d Henry VIII.* if the Jury believe the bond was duly executed, assigned and the deed made to Methvin under the proof.

2d. That the deed made by Hancock to Methvin was a legal conveyance; and as such, he could not afterwards convey to Perry and Holt, so as to pass any title to them as against his deed to Methvin, if the proof satisfies the Jury that the deed was made to Methvin, and in pursuance of the bond contract of 1828.

3d. That if Philip West was in possession of any part of the lot of land prior to Holt's possession, and prior to the purchase from Methvin; and in that possession, cultivating the land and using the products of the farm, that he had a right to buy from Methvin, and his deed from Methvin is a legal conveyance.

4th. That if Hines Holt was also in possession of a part of the land, and purchased from Hancock, that his deed must give way to West's, if West was first in possession, and his deed is older than Holt's.

5th. That if the Jury believe, under the charge of the Court, that Methvin and West held the title from the true William Hancock—and there is no deed out of said Hancock—or if a deed, one that could not convey any title—that although the deed to West may be void, yet, the plaintiff may recover

in the name of said Hancock by inserting in the pleadings, demises from themselves also.

6th. That if the Jury believe from the evidence that the purchase money was paid under the bond for titles, and the grant issued in pursuance of the contract in the bond, but that passed at the time of the issuing the grant a title to Thomas Kilpatrick or his heirs.

7th. That if the Jury believe the purchase money of the bond was paid at any time after its execution, at or before the execution of the deed to Methvin, the payment so made related to the time of the issuing of the grant, under the stipulations in the bond.

8th. That if William Hancock did, in 1828, execute his bond to convey title to said land, absolutely, to Thomas Kilpatrick, on the issuing of the grant, then, when the grant did issue in 1831, the title vested absolutely in said Kilpatrick.

9th. That if the defendant purchased a deed from William Hancock, the drawer, after he had conveyed his title by the bond to Kilpatrick, and his subsequent deed to Daniel Methvin in performance of said bond, then the defendants acquired no title whatever by such deed, as Hancock then had no title to convey.

All which requests the Court declined to give, and defendant excepted.

Plaintiff requested the Court to charge further :

That if the Jury are satisfied from the evidence that the execution under which the land was sold in 1832, at Sheriff's sale, was against William Hancock, *senior*, of a different district from that in which the William Hancock lived who drew the land, and not against the William Hancock who drew said lot, then such sale did not pass any title whatever to the purchaser at such sale, or to any one holding under that purchaser; and that the chain of title so commenced, no matter how regular, affords no defence, of itself, to the true owner—the drawer for instance.

But said charge, said presiding Judge declined to give as requested, but gave it by saying, in substance, in connection

therewith, that such a title might be good to support an adverse possession—none other.

To which charge, so given, plaintiffs excepted.

The Court charged the Jury as follows, by request of defendant:

1st. That a bond for titles does not constitute such a legal title that a plaintiff in ejectment can recover thereon; and that if the Jury believe from the evidence that the several demises in the names of Kilpatrick and of his heirs are supported only by a bond for titles, they must find for the defendant, on each demise based upon said bond.

2d. That when a bond has been executed according to its terms and conditions, it is no longer a subsisting contract for any purpose; and that if, therefore, the Jury believe from the evidence that the bond purporting to be executed by Hancock to Kilpatrick, and assigned by him to Methvin, has been executed by the execution of a deed from Hancock to Methvin, it constitutes no manner of title on which the lessors of the plaintiff or either of them can recover.

3d. That if the Jury believe from the evidence that when the deed from Hancock to Methvin, and from Methvin to West were executed, the defendant was in actual possession of the premises in dispute, under color of title and claim of right, then said deeds are void, and plaintiffs cannot recover thereon.

4th. That though the Jury may believe from the evidence that the title beginning from the Sheriff sale in 1832, and passing through Woolbright, Spence, Cowart, Wyche and others down to the defendant is not the true title; yet, if they believe that the defendant was in possession under such title, and under claim of right, such possession was adverse; and any purchase made, or deed executed by or to any person out of possession, while the defendant was so in possession, is void.

5th. That if the Jury believe from the evidence that Holt was in possession under the title commencing from the Sheriff sale in 1832, and that the William Hancock from whom he

derived title in 1847, was really the drawer of the lot of land in dispute, he had the right to make such purchase, and the deed so executed is not void.

6th. That if the Jury believe from the evidence that prior to 1847, West was in possession of any portion of said lot, and said possession was by mistake or accident, and not under color of title, or claim of right to said lot No. 282, 14th Lee, or any part thereof, then it was not such a possession as became adverse to the true owners or others claiming said lot; that to constitute such adverse possession, it must be open, notorious and under claim of right.

7th. That if the Jury believe from the evidence that William Hancock, one of the lessors of the plaintiff, was the true owner and drawer of said lot, and sold and conveyed to Perry and Holt in 1847, and before the commencement of this action he is estopped by said conveyance, and no recovery can be had on the demises in his name.

8th. That if the Jury should find for the plaintiff for either or any of said demises, they must specify in their verdict the particular demise or demises on which the same is rendered.

Counsel for plaintiff excepted also to these instructions of the Court to the Jury; and all of which charges and refusals to charge are assigned as error.

LYON & CLARK, for plaintiffs in error.

LOTT WARREN, HINES HOLT and E. A. NISBET, *contra.*

*By the Court.*—BENNING, J. delivering the opinion.

The Counsel for the plaintiff in error requested the Court to charge, amongst other things, this:

" That the deed made in March, 1847, by William Hancock to Daniel Methvin, the assignee of Kilpatrick, under the bond made by William Hancock in 1828, is not void for maintenance under the Statute 32*d Henry VIII.* if the Jury

believe the bond was duly executed, assigned and the deed made to Methvin under the proof."

This the Court would not charge, but charged the contrary of it. Was that right?

It seems that at the time when William Hancock made the bond, if he was not in the possession of the land, no one was; and that at the time when he made the deed to Methvin, in performance of the condition of the bond, Holt was in the possession of the land, and was holding it under a title, not derived from the William Hancock who was the obligor in the bond, but from another William Hancock.

The charge of the Court amounts to this: that the deed of Hancock to Methvin is contrary to the 32*d Henry* 8*th*, even, although, at the time when the deed was made, Hancock had the complete legal title, and Methvin the legal right to compel Hancock to transfer that title to him.

The question, therefore, becomes this: if the person who is the true owner of land makes a deed to it at a time when the land is held adversely to him, is the deed within the 32*d Henry* 8, even although he makes it in the performance of the condition of a bond of his, executed by him at a time when the land was not held adversely to him?

It is admitted by the Counsel for the defendant in error, that the bond of Hancock was, in its creation, not contrary to the Statute. And it is not insisted by them, that any instrument which, in its creation, is not in conflict with the Statute can, in the course of its after existence, get in conflict with it. Therefore, it is not insisted by them that the bond was first, or last, or at any time, in conflict with the Statute.

The Counsel for the defendants in error, then, do not insist that the *bond* stood in conflict with the Statute at the time when the deed was executed, in performance of the condition of the bond. All that they insist upon is, that the making of the *deed* was in conflict with the Statute; and their reason for insisting upon this is, that at the time of the making of

the deed, the land had come to be in the possession of one who was holding it adversely to the maker of the deed.

And this amounts to maintaining, that the Statute sanctions the bond, while it condemns the deed.

But if the Statute does that, it is contradictory of itself. For what is the bond? It is something which gives the obligee a right to have from the obligor a deed—this very deed. Whatever, therefore, sanctions the bond, sanctions that right. And whatever sanctions the right to have a thing, must sanction the thing when had. Therefore, if it be true, that the Statute sanctions the bond, it must be equally true, that it sanctions the deed. But if it sanctions the deed, and also condemns the deed, it is contradictory of itself. Let us, for the present, admit that it is thus contradictory of itself.

Now when a Statute is contradictory of itself, one of the contradictory parts has, of necessity, to be disregarded; and in such case, which part it shall be, is the only question.

In determining such a question, there are some rules which may be safely followed.

If of the two parts, one be penal and the other not; or if one be such, that it might so operate as to deprive a person of a right, fairly purchased and fully paid for, to the benefit of a mere wrong-doer, and the other such that it could not so operate; or if one should go beyond the objects of the Statute, as declared in the preamble, and the other should not, but should fall within those objects; in all these cases it is the former, rather than the latter, that is to be disregarded.

This is too self-evident to require proof. We may proceed, therefore, to apply it.

The part of the Statute that would condemn the deed would unconditionally impose a penalty on Hancock, the donor, and would conditionally impose one on Methvin, the donee, a penalty equal to the whole value of the land; the part that would sanction the deed would not impose any penalty upon any body.

The part that would condemn the deed might go further— it might deprive Methvin of the land itself, although he had

fairly purchased and fully paid for it. This may be thus shown: The entire obligation which Hancock's bond imposes: on him is such, that it would be satisfied by his merely making a *deed* for the land to Methvin, the holder of the bond. The *bond* does not impose on him the additional duty to put Methvin in possession of the land, or to lend Methvin his name to be used by Methvin in putting himself in possession of it. And the bond is all that they have put between themselves. This being so, whatever would render the deed, if made void, might deprive Methvin of the land, for it might put him in a condition in which he would have no means of getting possession of the land. Will it be said, that a Court would require Hancock to lend Methvin his name in ejectment to recover the land? But every time a Court does anything of that sort, it strains the law, and does so only to accomplish, in a roundabout way, what would be accomplished in the direct way, if such a deed as that in question were allowed to be valid. I say, then, that unless some Court interposed in this stronghand mode, the annulling of this deed might deprive Methvin of the land itself; at least, it would put him at the mercy of Hancock.

But of the two contradictory parts, the one that would sanction the deed, would confer on Methvin the means of securing the enjoyment of the land; the deed, if valid, would insure him the land.

Of those two parts, then, the one that would condemn the deed, would inflict a penalty on Hancock, and might inflict one on Methvin, and might, in addition, deprive Methvin of the land itself, though he had fairly bought it, and from one who had the right to sell it.

And be it observed, that this last effect would be, strictly, *ex post facto.*

But such effects as these, are entirely beyond the objects of the Statute, as the objects of it are stated in the preamble. As there stated, those objects are, " The due and just ministration" of the laws, "and the true and indifferent trials of such titles and issues," as are to be tried.

Doe *et al.* *vs.* Roe *et al.*

And the great effect of the due and just ministration of the law, as well as of true and indifferent trials is, to give every man the enjoyment of his rights.

The bond that Methvin held, gave him the right to have a conveyance of the land made to him by Hancock.

If, therefore, we say that such a conveyance, when made,. is valid, we say that which will subserve the objects of the Statute. If we say that it is void, we say that which will not subserve those objects.

Of the two contradictory parts of the Statute, therefore, the part which would make this deed valid, is the one which must govern.

This is the result at which we arrive, if we admit that the Statute is contradictory of itself—one part of it saying that the deed is void—another part that it is valid, if we admit that the Statute condemns the deed while it sanctions the bond.

But the Counsel for the plaintiff in error, does not admit this ; he contends that the Statute, whilst it sanctions the bond, does not, if taken according to its true intent and meaning, condemn the deed.

And in support of this position, besides referring to the part of the preamble above quoted, as evidence to show that the true intent of the Statute could not have been to produce any effect by which an innocent man might practically lose the enjoyment of what he had fairly purchased and paid for, he relied on this passage, from 1 *Plow.* 88: "And therefore, the Statute of *Articuli Super Chartas, cap.* 11, ordains that *no officer nor any other, (for to have part of the thing in the plea,) shall take upon him the business that is in suit ;* yet, if the tenant, pending a *præcipe quod reddat* against him, infeoffs his son and heir apparent, this shall be out of the danger of the Statute, as it is taken in 6 *Ed.* 3 ; for the son could not be said a maintainer to the father ; but on the contrary, he is bound to aid his father as often as he can." And on this proposition, from 5 *Com. Dig. "Maintenance,"*

(A. 3,) "But it will not be champerty if A contracts with B. for a manor for which B is afterwards impleaded, and *pendente lite* B conveys it to A."

These authorities showed, as he contended, that whatever is done in the performance of a duty or of an obligation, is not within such a Statute as this.

There are some other authorities that countenance this view.

Thus, it is not maintenance "if a lessor pays fees or maintains the suit for his lessee in ejectment;" or, "if a landlord sues in the name of his tenant to try a right," or "if a mortgagee not a party in a suit, advances money to support the title." (5 *Com. Dig.* "*Maintenance*" (*B.*)

In all of these cases there is a duty, or at least a right, to maintain the suit ; and it is, for that reason, no doubt that it was decided that the cases were not within the *intent* of the Statutes against maintenance.

There are other cases more analogous in their facts, if not in their principle, to the present case; but they are "American" cases. In some of the States, it has been held that a deed made under just circumstances, as those under which this was made, was good. I merely refer to some of those cases, not feeling at liberty to place much reliance on them. I refer, then, to 10 *Humph.* 92; 10 *Yerg.* 12; 7 *do.* 308; 1 *Johns. Cas.* 85; 7 *Wend.* 377.

If the proposition contended for by the plaintiff in error, viz: that whatever is done in the performance of a duty or of an obligation, is not within the Statute, then this deed, was not within it, for this deed was made in the performance of the condition of a bond.

Suppose, however, that when Hancock made this deed he was under no previously existing obligation to make it? That the deed, in that case, would have been within the Statute, seemed to be regarded by the Counsel for the defendant in error as too clear to admit of a doubt. And yet, according to the latest English decision on the subject that I have seen, the deed would not have been within the Statute.

The head note of the case in which that decision was made, is as follows: "W M died leaving two sons, who died without issue. The survivor of them devised his estate to his wife for life—remainder, to all and every the children of Richard E and M P, who should be living at the time of his wife's death. There were living at her death nine children of R E and M P. Of these, two during her life, and while their estates remained contingent, had levied fines *sur conusance de droit come ceo* of their shares. In April, 1824, A B entered upon the lands comprised in the marriage settlement, and kept possession; and in May, 1824, all of the children of R E and M P, by lease and release, conveyed the lands comprised in the marriage settlement, in given proportions, to a purchaser: *Held,* that the children of R E and M P might convey their interests without having first made any entry into the land, although A B was in possession." I remark, that A B was thus in possession, claiming as heir-at-law, and that this claim was entirely in opposition to the claim of the plaintiffs. His possession was, therefore, adverse to their claim, if the possession of Holt was adverse to the claim of Methvin.

This case seems to have been most elaborately argued; it involved several important points.

Speaking on the point in question in our case, the Justice delivering the opinion of the Court says: "There is no authority to show such a conveyance to be inoperative. In *Co. Litt.* 49, *a,* it is said: "if the feoffor be out of possession, a fine, recovery indenture of bargain and sale enrolled, or other conveyance, does not avoid an estate by wrong." It does not say the conveyance is void. But what estate had the defendant here? The remainder-men were entitled to treat him as having an estate by intrusion, for the sake of the remedy; but it does not lie in his mouth, as against them, to say he had any estate. What are the facts? On the 19th of March, 1824, Peggy Martin, the tenant for life, died. Was any one then in possession? The case does not state the fact. Did any of the remainder-men enter, or any per-

*Doe et al. vs. Roe et al.*

son on their behalf? The case, as to that, is silent. Some
time in April, *non constat* when, the defendant entered and
began to plough the fields. This was objected to on the part
of Brune, but not by the persons in whom the legal estate
was vested. But did Brune know it? Did Coode or any
one of the remainder-men know it? *Non constat* that they
did. Had the sale been of a pretended title only, the case
would have been within the operation of the 32 *H.* 8, *c*, 9.
But to bring a case within that Statute, the seller must have
a pretended right only, and the information must aver that
it is a pretended right only,.for that is the point of the ac-
tion. (*Rex vs. Barnes, Cro. Cas.* 233 *;* 1 *Hawk. c,* 86, *s,* 10 *;*
*Dy.* 74.) This was a sale, not of a pretended but of a valid
title, where the possession had gone with the title until within
two months of the sale, and there had been no act of disposses-
sion until within a much shorter period. It has been argued, that
the conduct of the defendant amounted to what the law con-
siders an intrusion ; and that at the time of the conveyance of
May, 1824, the defendant was in the land as an intruder.
But what does the law consider an intrusion? Not a mere
wrongful entry into possession, (unless the rightful owner
chooses so to consider it,) but a wrongful possession of the
*freehold ;* and what Lord *Ellenborough* lays down in *Wil-
liam vs. Thomas,* (12 *East,* 155,) as to disseizin, applies also
to the case of intrusion, both equally ousting the right owner,
not from the possession merely, but from the possession of
the freehold. He there says, "Disseizin was formerly a
notorious act, when the disseizor put himself in the place of
the disseizee as tenant of the freehold and performed the
acts of the freeholder, and appeared in that character in the
Lords' Court." But what act of notoriety is here stated to
have been done by the defendant as claiming to put himself
in the place of the rightful owner? At most, he was only in
possession six weeks. It appears to me that he had no such
estate by wrong, as to prevent the remainder-men from ma-
king a valid conveyance." This is .the language of the Jus-
tice—Mr. Justice *Bailey.*

Doe *et al.* *vs.* Roe *et al.*

The possession of the defendant in this case, whether it was adverse to the title of the remainder-men or not, was precisely such a possession as is the possession of the defend-ant in our case. And the decision is, that a deed made in the face of such a possession, and made, too, when there existed no obligation on the makers of it to make it, is not within the Statute.

[1.] On the whole, the conclusion to which we come is, that a deed for land, although it is made at a time when the land is held adversely to the maker of the deed, is not within the Statute of the 32d *Henry VIII.* if it is made in the performance of the condition of a bond executed by the maker of the deed at a time when the land was not held adversely to him, and if he is the person who had the title to the land.

And consequently, we think that the Court below should, with respect to the point now under consideration, have given the charge which it was requested to give by the plaintiff in error, instead of the charge which it gave.

There are other questions of some importance in this case, and particularly the question, whether the Statute of the 32d *Henry* 8 is in force in Georgia. I doubt whether it is; and perhaps I am not the only member of the Court who so doubts. The conclusion announced proceeds, however, upon the assumption that the Statute is in force in Georgia. But, as one member of the Court is absent, none of these other questions are decided. The question which is decided, is a leading one in the case ; and the decision of it may, per-haps, be sufficient for a final determination of the case.